In the first case, David Rubin, appearing for a pass. May it please the court. I have an extra five, but I reserve three minutes for rebuttal. I'm sorry, it is for the tape, but it's the Worth v. Telcordia Technologies. Are you sure a minute is that enough? I said three minutes, Your Honor. Oh, three minutes, okay. May it please the court. Before I address the particular merits of why we're here, I just want to comment very briefly on what is at stake for our clients in this case. Well, unless it's relevant to our legal analysis. I believe it is, and it's discussed in the briefs. Okay, it's not just an emotional argument about what's at stake. No, sir. Okay, great. And it's discussed in our briefs and it's outlined in the appendix at page 661. This is not just a case about the loss of 60 days' pay. In the fall of 2001, if you were an employee at Telcordia, you would have been eligible for a pension benefit that you would have had to wait until age 65 for. And at that point, you could draw an annuity with no right to survivorship. If you were still on the payroll as of January 1, 2002, which all of our clients would have been if they received a 60 days' notice under the WARN Act, plus their accumulated days off, they would have been entitled to a far more lucrative pension benefit, which would have consisted of something called pension choice, where they could have withdrawn the accumulated amount in their account were they to leave, minus deductions. They could have rolled it over into a private IRA. They could have transported it to a new 401k plan with a new employer. The estimated present value of that, we believe, it's not for now, is in the millions. So far more at stake than just 60 days' loss of pay. As to the issues before this court. Let me ask this. If you're right on the fraud issue, the equitable fraud, so we have to get into anything else? Because the district court really limited the issue to see entering fraud. That was going to be one of my points. They completely ignored the other argument we made. But yes, we went on fraud. We're back before the district court, and the case moves on. Now, the question, one of the big issues here is, if you ask questions of someone else, and they give you their opinion on the law, how is that necessarily a misrepresentation that could be, let alone a fraud? It may not be, but that's not what happened here, Your Honor. There was a misrepresentation of fact here. Why don't we start from the beginning, and then you tell us where you think there is a misrepresentation of fact. There's four people here, Walt, primarily. Is that correct? Well, they're the four plaintiffs so far. We haven't moved from last certification yet. Let's go through the facts. If you think there is a fact misrepresentation, or a dispute about a misrepresentation of fact. Let me talk about the two most troubling ones in the record. For starters, the underrepresentation of layoff figures to the Department of Labor. The record here is clear that Ms. Cole, the head of... To the Department of Labor, or the website? Well, the New Jersey Department of Labor, and the website, because our position here, and it's amply supported in the record, is that the figures that were reported on the website were consistent with what Telcordia had reported to the Department of Labor. And the Department of Labor, they reported statewide how many? Well, no, they reported actually by individual sites. If you look at the letters that were written to the Department of Labor, which are in the record at Appendix 551 to 562. But weren't the website figures statewide? The website figures were statewide. So what your clients read were statewide figures, which wouldn't tell them anything about the Piscataway site. But even if you compare, those numbers standing alone would not. But if you looked at those figures, they were seriously depressed from what the actual layoff figures ended up being. For example, the numbers for Piscataway, for all of Piscataway, even if you assume Piscataway were a single site, I understand that's a disputed issue here, but employees were entitled to assume for themselves that it was when they decided to waive a Warnack claim. There were 463 employees reported as laid off from all of Piscataway in the three-month period September to November. Thirty-seven short of the 500 cutoff over the 90-day period. In fact, in Discovery, and this appears at pages 606 of the appendix, et cetera, if you look at the actual layoff figures that Telcordia disclosed in Discovery during that same three-month 90-day period, there were 651 employees laid off, well above the 500 cutoff. And that does not even include telecommuters and other remote employees who apparently were not included here. And there are two separate 90-day periods where if you look at Telcordia's own figures, whether it's September through October or October through December, it's either 651 employees actually laid off or 639 employees actually laid off during either one of those 90-day periods based on Telcordia's own records. They never reported that to the state. That's misrepresentation number one. Misrepresentation number two, in response to Judge Ambrose's question, Ms. Cole, who is the head of HR, admitted that when they started the layoffs, they gathered around all of their HR partners, as they called them, and crafted together a very carefully scripted set of talking points which were to be told uniformly to the entire workforce. And Ms. Cole, in her deposition, principally at pages 451 and 452, and there is just before and after those in the appendix, essentially admits that the message that was being sent, we can parse the verbiage all day if we'd like, but the message that was intended to be sent was, number one, we are aware. In fact, we are aware of our responsibilities under the Warren Act. We familiarize ourselves with the Warren Act. As a matter of fact, her letter at appendix 508 even says that. And we are applying the standards of the Warren Act scrupulously to the layoff figures. What's false about that? What's wrong with that? Because Ms. Cole has admitted in her deposition that they were not, in fact, even considering the standards of the Warren Act. She has said in her deposition at pages 423 and 424 of the appendix that they didn't even consider the standards of the Warren Act. But wasn't that in the context they didn't consider because they didn't think it applied? What she said was they did not consider it at all in even determining whether it applied or not. Let's look at the first thing, I think, was Cole's letter to Ms. Revere. It fire-weighted the appendix, yes, sir. And she says in there that we are very familiar with the Warren Act, and if the requirements of the Warren Act are triggered, the company will certainly comply with it. We have been analyzing the telephonic data on an ongoing basis to ensure the company's compliance, period, close quote. What is – where's the fraud there? The fraud is in this respect, Your Honor. She said she was familiar with the standards of the Warren Act and they were being applied to the facts at hand, whereas she says in her deposition – now bear in mind, the determination of what is or isn't a single site is the threshold question in determining whether the Warren Act is triggered. She says in her deposition we never even considered the standards of the Warren Act. What were the exact words of the pages 423 and 424 of the deposition then where she says we never considered the Warren Act despite the fact she sent a letter that says that we're intimately familiar with the Warren Act? In page 423, she was asked how she determined to characterize Piscataway as three sites instead of one site. She indicates that in terms of why I made the decision around four or five sites statewide is because we had adopted – we were adopting the same approach that we were using with the OFCCP, the Office of Federal Contract Compliance. Question, does the OFCCP have the same regulations as the Warren Act? Answer, I don't know. Question, this letter, the Revere letter, was being sent to the Department of Labor addressing issues concerning the Warren Act, correct? Answer, correct. Answer, did you in making the decision to differentiate these sites, whether it be three in Piscataway or five in New Jersey, did you refer to any of the rules or regulations or guidelines concerning the Warren Act? Answer, no. Okay. What is that saying that I didn't know anything about the Warren Act? What she's saying is that she did not consider the Warren Act in determining whether there was or was not a single site. The letter doesn't talk about single site versus multiple site. It just talks about the Warren Act as something in existence that she was aware of and said she intended to comply with. So I don't see the falsity. I'm stuck where Judge Ambrose is.  The falsity, Your Honor, is that she's writing a letter, she acknowledges that the Warren Act is in the picture here because she's writing a letter to the state Warren Act website advising them of what layout figures exist. She's indicating that we are familiar with the standards of the Warren Act and are applying those standards to our figures to see whether or not the 500 employee threshold is triggered. In fact, she was not, that was a misstatement of fact. She was not even applying the standards of the Warren Act. It would be one thing if she had said we analyzed the case law and the regulations under what constitutes a single site under the Warren Act that we've determined based upon our review of those standards under the Warren Act and the case law and the regs that this is three sites rather than one. She admits she never even did that. What she said was, I didn't even refer to them. So what she's telling the workforce, trust us. We have checked this out. Trust our analysis. Not that an employee would have had to. That's your conclusion or argument based on the facts that are there. But where, where is there, I mean fraud's a high threshold. It's not just something you can extrapolate and you've got to meet a, I mean, plead with particularity and have, it's a high threshold because it's a serious allegation. And it is a serious allegation, but bear in mind that equitable fraud does not require the level of intent. And by all accounts here, including the trial judge, equitable fraud is all we needed to show. There was no intent to defraud necessary here. He admitted that, which is one of the principal errors the judge made in that analysis, that after saying that equitable fraud is all that applies, he proceeded to then require that we show intent to mislead and defraud. I don't read it that way. It seems to me we're just playing games with words here. We've got to be able to compare X with Y. If we're looking at the Redeer letter versus the deposition testimony, we can look at precise language and we can decide what the conflict is, if any. But if we're going to talk at the level of your impression or characterization of what words mean, we're just in Never Never Land. You have one view and the next person would have a different view and the next person would have a different view. We're not allowed to engage in that kind of exercise. Your Honor, I respectfully believe you are required to engage in the exercise of what a reasonable juror could infer reasonably or what a reasonable employee could have inferred reasonably from her words. A reasonable employee could have inferred, and as I read her deposition testimony, it was her intention to convey that we are familiar with the Warren Act standards. Well, she admits that wasn't so. You read to me that she says that I don't see that. You're relying on the 19th letter, October 19th letter, that's what you're relying on. Yeah, that 508 of the opinion. She says we are familiar with the Warren Act. What she says is she was not even aware of and didn't refer to and certainly did not apply the Warren Act standards in determining whether Piscataway was a single site. Yeah, but single site wasn't discussed in the letter. So I don't see the conflict between the single site issue and the general statement about being aware of the act and intending to follow it. Because the determination of single site is the threshold consideration in whether the Warren Act applies. I see my time is running out. If I may address one more issue. The judge did not address at all our argument under the general totality of the circumstances test about the opportunity to negotiate. There clearly was at least a factual question as to whether there was a reasonable opportunity to negotiate. These releases here, it's addressed at page 31 of our brief. No one could conclude from this record that there was any opportunity to negotiate here. What's the testimony that shows that the negotiation was requested or attempted and cut off and refused by the company? Well, there are affidavits, Your Honor, that were submitted in the record at pages 666 and 668 by two of the plaintiffs where they indicated that based upon their reading of the letter and frankly based upon my reading of the letter and in one case even going to see a lawyer about it. So that wasn't my question. My question was whether they attempted to negotiate and were told, no, no, we're not going to negotiate. Neither they or other than a few individuals who Mr. Ramirez has approached them, of the 800 or so people who were being laid off, none of our people attempted to negotiate. And it would have been highly implausible under these circumstances that the company was serious about negotiating with 800 employees who was laying off on one week's notice. Nothing in their letter suggested they were willing to do so. And the circumstances strongly indicate the implausibility of that being an opportunity. This is a sign here for you're out of here. The fact that a couple of people may have approached them with lawyers for all we know who may have had valid discrimination claims or other claims, that's not the benchmark for determining that the most aggressive potential litigant is not the benchmark for determining whether there was a reasonable opportunity to negotiate. Some people don't need an opportunity. They'll create one. That's not the standard here. I see my time has expired. I reserve 30 minutes for questions. Thank you. Mr. Dean? May it please the court, my name is Francis X. Dean from McElroy, Deutsch, Mulvaney & Carpenter and I represent Happily's. If I may, let me just address a few issues. With respect to the Cole letter, any fair reading of that letter shows that there was no misrepresentation. Hold on a second. We are familiar with the Warn Act. You may be right on that, but when you state that you're familiar with the Warn Act, it strongly suggests that, and then she says that, if the requirements of the Warn Act are triggered, the company will certainly comply with it. But then she says, whether she's familiar with it or not, they basically ignored it in doing their deposition testimony. She used figures that were submitted pursuant to the contracting document that they have to submit to the government, which is very different than the Warn Act requirement. But why wouldn't that letter sent to an employee, suggested employee, basically don't worry about the Warn Act because we've got you covered, basically. And if it applies, we're going to, if the Act applies, we're going to comply with that letter. So don't worry about that. We've got your back here. That's basically, I think, any common sense reading of that letter would be by an employee to say, okay, well, I'm not going to worry about it. Ms. Cole is looking out for me, and if I haven't entitled anything to the Warn Act, I'm going to get that. But then she's saying, well, basically we ignored the Warn Act because the data that we supplied, we didn't comply or attempt to comply with the Warn Act. Why wouldn't that be misleading? I must respectfully disagree, Your Honor. First of all, in terms of what she said in the letter, she said we are familiar with the Warn Act. One, she didn't say I am familiar with the Warn Act personally. She said we are familiar with the Warn Act. She was writing this on teleporting technology letterhead, and you're saying the difference is she didn't say I am familiar with it, and she said we are familiar with it? She said we talking about the company itself. I mean, obviously they have in-house lawyers and so on and so forth. Secondly, with respect to what she's saying is we are familiar with the Warn Act. Whether she's saying I am familiar with the Warn Act or the company is familiar with the Warn Act, the fact of the matter is she was familiar with the Warn Act, and there's nothing in her deposition testimony that says she was not familiar with the Warn Act. Is there anything, I mean, looking at this from 10,000 feet, the way this works under the Warn Act, and I had some familiarity with it in private practice, the question here is do you aggregate sites, do you consolidate them for purposes of counting the number of employees? You here have three sites, and why is it that you would not consolidate them for purposes of analyzing whether you meet the threshold for needing to comply with the Warn Act? Some of them were consolidated. Some of them were not, Your Honor. And the reason is looking, if you look at the case law on this, there's a mix of case law. There are some cases where it's two localities across the street from each other that are considered separate sites of employment. Yeah, but there are very specific factors that are supposed to go into that analysis under the regulations. The opposing counsel quotes her testimony at deposition of saying she didn't even look at those regulations when they made the decision of whether it was one site or three or five. Whether she's right or wrong in terms of looking at the regulations or not looking at the regulations, the fact of the matter is she said she was familiar with the statute itself, and she never in a deposition said… Yeah, but she said the company intended to apply the statute, and if to do so one needs to apply factors that are set forth in the reg in which she admits she didn't apply, then it's pretty inconsistent to say you're complying with the Act but you're not going to apply the factors in the reg that you have to apply to comply with the Act. Not very consistent. I must disagree, Your Honor, in terms of she's not a lawyer. It doesn't make any difference. She's admitting she didn't even look at the factors, that she did the aggregation on some other set of criteria outside of the regs, which are the only governing criteria. Well, the regs are just guidance. The regs are not absolute. The statute is the starting point, and she never said… Come on. She has to follow the regs that apply the statute. That's why the regs exist. Whether she's a lawyer or not. She's the vice president of human resources. This is her job. This is what they pay her to do. If you don't… I mean, it's inconceivable she should not… I mean, a prerequisite for this job is you know the warrant application. We don't know if she did or did not, but if she didn't, that would be a serious breach of her duties. Well, whether it's a breach of her duty or not, it's certainly not a fraudulent misrepresentation. You're saying the main thing… One of the main… Maybe not the main distinction you're drawing is because she said we are very familiar, and she didn't say I am very familiar. That's a minor distinction. You're making that a very major distinction. But it's a distinction, okay? It's a distinction. The fact of the matter is whether there was a fraudulent misrepresentation. She didn't say I've analyzed the case law. She didn't say I've analyzed the regulations. She said we're familiar with the Warrant Act, and we intend to comply with it. And there's not one shred of evidence to indicate that she wasn't familiar with the Warrant Act. But there is evidence to suggest she didn't intend to comply with it. No, not at all. She said she never consulted it. No, she didn't look at the regulations. Pardon? She didn't read the regulations. How can you comply with a complex federal statute without reading and applying the regulations? I don't dispute the fact, Your Honor, that I wish she had looked at the regulations. But the fact that she didn't look at the regulations is not a fraudulent misrepresentation. Did somebody else within the company look at the regulations for her? Obviously, the legal department looked at it, but there's no record evidence of that. Well, I keep coming back. Usually what happens if you're trying to get outside the Warrant Act and you're trying to avoid the benefits, you're not going to aggregate the sites, and then you're going to say that here are the reasons why we don't have to aggregate, and therefore we don't have to comply with the Warrant Act in giving the 60 days notice and the possible additional benefits. But was there analysis done within the company as to whether this was a single site or separate sites? I mean, there obviously are a number of factors under the regulations, such as whether they share employees, management and equipment, whether they manufacture the same products or conduct the same operations, whether they have contiguous buildings. Was an analysis done of those factors? Yes, but that's not in the record. Not in the record. It's not in the record. But because this opposition is... I mean, just to tease out the threat, what happens is, okay, you make an analysis that you believe there's a plausible argument that you should do separate sites, and then what you do is you tell the employees that these are separate sites, the Warrant Act doesn't apply, and would like you to sign this release. And then the question becomes, what information do they have in order to be knowledgeable about whether to sign the release? First of all, Your Honor, this letter is written to one person, Radir. And it was written to Radir in response to an inquiry or an email that she had written. Wasn't the same thing put up on the website? No. What was the website? The website is an employee website, Your Honor. It's not an official Tuckordia website. And Radir took... The evidence is that Radir took the letter, and she couldn't testify that she paraphrased it exactly, but she took the letter and paraphrased it and retyped it and put it up on the employee website, not the Tuckordia website. In addition to the October 19 letter, you had the information provided by the supervisors and human resources personnel, right? I mean, that's one of the things that's talked about here. It was on the company website. On the company website. And also the town meetings. And the town meetings. These individuals didn't attend the town meetings. That's all you're saying. You didn't do it? I can't believe I'm letting you do this. There was no denial. One, we're in summary judgment, so we interpret... We have to take their allegations as true. And there was no denial about what was said at the town meetings. As I read this, there were representations made at the town meeting. There was an e-mail that was sent out, I think, on October 22. And there was an October 19 letter. And then there was the FAQ section on the Internet. People only ask questions. And the statistics provided by the Department of Labor and would go on. I mean, there's a bunch of stuff here. It's at least six things. Also, the site designations. First of all, Your Honor, in terms of the site designation, the issue before us here today is not whether we were right or wrong on the site designation. If that were the issue, then I would be upset. No, but in effect, their argument is that you were wrong. You either knew you were wrong or didn't care that you were wrong. And there was information given out that would lead one to believe that there was, quote, equitable fraud with regard to getting these folks to sign the releases. So I will concede that a statement of law is not misrepresentation. But there were other things noted in these. For example, the Smith e-mail that Judge McKee referred to on October 22 from the California's president. You take that with the call letter, with the frequently asked questions, with the town meetings, the statistics provided by the Department of Labor, and they're saying together they paint a very different picture from what was being told to the employees. No, no, no, Your Honor. I'm just telling you that's their argument. I know it's your argument. It's summary judgment. But it's an incorrect argument. First of all, in terms of... I understand you're saying it's the incorrect argument, but the point is, at summary judgment, are there issues of fact pertaining to the types of representations as to whether those representations have a miss in front of them? No, Your Honor. There's no issue of fact here. Let's take the call letter first. The call letter is perfectly accurate. It doesn't say we've analyzed the regulations. It doesn't say we've analyzed the T's. We are familiar with one. We are intimately familiar with one. And if it applies? We're going to comply to the T. And we will comply with it. And that's a statement of intent. That is not a statement of intent. The comply with one is not a misstatement of intent. But what Mr. Rubin is saying, they make that statement, and, in fact, they did not intend to comply. I mean, I'm not saying he's right or wrong. I'm just saying he's making that statement, and he's saying that there is a disputed fact here, and how can the court decide at summary judgment on that fact? Very simply, Your Honor. There's no evidence whatsoever to dispute the fact that the company intended to comply with one. Well, there's evidence that would allow the fact finder to conclude that. But not to comply with one. Not to comply. Because they never did anything to comply with it. I mean, a fact finder could look at this and then look at what Ms. Cole says in her deposition and conclude that they made a statement that they intended to comply with an act, but the subsequent activity shows they never intended to comply with the act because they never did anything to comply with the act. Now, if a reasonable juror could conclude that, it seems to me it would be hard for a reasonable juror not to conclude that. That's not our jury, Your Honor. Okay. You don't think she didn't check the regulations, you're saying? She's a lawyer, not a lawyer. I understand that. You're saying she didn't check the regulations. She hadn't. You can't have a lawyer saying she's intimately familiar with the act, and then she didn't check the act because she's not a lawyer and I guess therefore didn't know about the regulations. Is there a record that she got memos or had discussions with the legal department? No, Your Honor. What was the basis then of the aggregation decision the company made? I'm sorry, Your Honor? What was the basis of the aggregation decision the company actually made? Well, if you look at the facts, the separate sites that were not aggregated, some sites were aggregated and other sites were not aggregated. It was where there was a substantial interchange, not where there was just a momentary interchange or a slight interchange. I thought the evidence was that the company chose to use the aggregation method under a different statute that had something to do with contract reporting and had nothing at all to do with the Warren Act. That's correct, Your Honor. Well, how is that complying with the Warren Act to comply with a different statute? It's similar in terms of how they separate sites of employment. I agree that if this were a case where we were looking at the question of whether the company were right or wrong, we'd have to look at the facts and see whether the facts showed that the company properly separated out the sites of employment. But the question here is not whether Carol Cole was negligent in not looking at the regulations. The question is whether or not there was a fraudulent misrepresentation. Well, why did they look at the different act? Why did they look at the separation for separate sites arising out of the Contract Compliance Act as opposed to the Warren Act? Why did they do that? Carol Cole didn't do that? The record doesn't reflect that? Whoever this metaphysical we is that appears in the October 19th letter written in the Telecordia Technologies letterhead, whoever that great guy we is, why didn't we look at the Warren Act requirements as opposed to the contract? The record doesn't address that, Your Honor. Well, could a reasonable juror conclude that they didn't look at the applicable regulations because it has to be one of two answers. One, either they weren't very familiar with which regulations applied or they were familiar and simply didn't care to apply the Warren Act and they got a better result under the contract regs than they did under the Warren Act regs. It's got to be one of those two things. No, Your Honor. What other reason could there be? Either they didn't know about it or they knew about it and didn't care to apply it. What other explanation could there be? The other explanation is they made a mistake and they should have looked at it more carefully. Well, if they made a mistake, then they weren't very familiar with the act. Very familiar with the act is a question of opinion, Your Honor. Is this a question of fact, Brad? Well, the opinion argument you're making is coming out of the puffery. The number of district court cases here that are cited for the wrong of doctrine that when you've got something that basically constitutes puffery, that's not sufficient grounds for fraud and usually the reason it isn't because it's not reasonable to rely upon that kind of intent or future statement. And they usually arise out of an economic context or a forward projection of a market situation, which we really don't have here. We have a group of employees in a very particular situation about to lose their jobs. They're relying upon someone whose title is, kind of euphemistically, president of human resources, not a lawyer, merely the vice president of human resources. I don't know what she's paid to do, but a reasonable juror could conclude that one thing she's paid to do is to be familiar with all that stuff that applies to human resources. Little things like, well, you get noticed when you're laid off, little things like that. The Warren Act that she says she's very familiar with. And then she decides not to apply the Warren Act that she's very familiar with. And you're saying a reasonable juror couldn't conclude that that's a misrepresentation, the fact that she was very familiar with it. No, Your Honor, stating that she's very familiar with the Warren Act, and just because she didn't look at the regulations, and just because she didn't do it the way perhaps you and I would like her to do it, does not mean it's a misrepresentation. Nor is it a question of fact. Nor is it a question of fact. And they've offered nothing to show that she's making a misrepresentation. And very familiar adds different connotations. It doesn't necessarily mean she knows everything about the Act. Your Honor, the poor Mr. Rubin is chomping at the bit back there. He can't see him. He's bobbing up. I can see him. Like the racehorse that goes into the starting gate and they have to hold him back. That's the issue. If we were to litigate any underlying merits, it would be a different record here. But the fact of the matter is, this is not a case about the merits or whether the company is right or wrong on a single side issue. It's a question of whether or not it was a misrepresentation. And this was in response. This letter by Cole was in response to Radir's email. Was there anything peculiar about Radir's facts compared to the facts relevant to all the other people dismissed at the same time? No, but if you look at all the other people. So if all the other plaintiffs had written a letter of inquiry, they would have gotten the same letter that Radir got. So I don't see how you can suggest that the Radir letter somehow was relevant only to Radir and not to anybody else. And therefore, if the rest of them read it or heard about its contents, it was immaterial. Others would see it. But wouldn't it be foreseeable that others, maybe not that she's going to put it up on the Internet, but it's certainly foreseeable that other employees are going to see this letter written to an employee in the context of a pending layoff and a shutdown? No, you're right. Well, isn't that a question of fact? Whether or not it should have been foreseeable that Rosamund Radir got this letter. She might have decided to share it with one of these folks she'd been working next to all these years. The question is not whether she might have shared it. The question is whether or not it was intended to be shared. Would it go back into... It was a question of whether or not... In order for it to be relianced by others upon the letter to Radir, the question is whether or not the company intended to have that letter go to others other than Radir. But there was no restriction put on it. It wasn't marked confidential. It didn't contain some legend saying this information is confidential and you may not share it with any fellow workers. I don't understand why it wasn't as good as a public letter. Oh, no, you're right. If I write a letter to one employee, that doesn't mean it's going to be shared with every other employee. I certainly don't intend that. Absolutely not. But don't you... Isn't it natural to think that the employees... This was not a union shop, right? No. So... But the employees did have a website among themselves, right? Yes. So they're trying to communicate information. I mean, wouldn't it be natural to think that Radir is going to communicate that information that's imparted to her by call onto the website for the employees? But that's not the test, Your Honor. The test is whether the company intended it. It... I know it is the test, but whether the company intended it is not the test. Isn't it natural to think that she's going to share that information? Yes or no? I think yes. But that's not the test. I understand. That wasn't... I'm not saying it's a test. Thank you. Your light is on. May I just add one comment? If you look at these numbers... Do you want my answer to that? Or do you want me to go ahead and add the number? Yes. Because the answer was going to be no. We have your argument. Okay. Okay. Thank you, Your Honor. Mr. Truman, now. I'm so sorry, Your Honor. It's all right. I'll give back some of my three minutes because I'm not sure I'm going to need it all. But a couple of quick points to address some things that came up. Inviting the Court's attention to page 422 of the appendix in terms of who made the decision to designate a single site. The Court can read it for itself. Clearly, Ms. Cole is saying, I made the decision to designate these as sites. Who made the decision? I made it, quote, unquote. And then in pages 423 and 424, she explains it. This was not a situation where they weren't sure what the MORNAC said, so they just sort of threw a dart. It was an affirmative decision to apply a different statute, the OFCCP guidelines. So apparently, thought was given, and they decided not to apply the MORNAC. So those are two quick points. In addition, in terms of the foreseeability of this get-out into the workforce, I'd simply invite the Court's attention to pages 444 to 449 of the appendix, where Ms. Coleman is very clear that this was a carefully scripted set of talking points and at every opportunity, whether it was in a letter to an employee, at a town meeting, the intention was to send the same message to their credit. The intention was to send consistent messages to what the company's position was. Were the employees – obviously, this is a very significant event in their professional lives. Weren't the employees communicating with each other on this website, among other things? You bet they were. As a matter of fact, Mr. Chappelle – One of the things that – I mean, it's sort of like – it's not in the back of your mind. It's in the front of your mind. Are they – we have the Warrant Act rights. Are they complying with the Warrant Act? Now, these aren't necessarily lawyers, but you would think that somebody on behalf of the employees would consult with a lawyer, a labor lawyer, to see if they're going to let you stand on to make sure that the company complies with the Warrant Act. Was that done here? Well, we know that one of the employees, I believe Ms. Landino, went to speak with a lawyer about her severance package. The record doesn't reflect what was discussed between them, except to the extent that she got the impression that it was a non-negotiable deal. But the point made in our brief is this. If they come to see me, and I had consulted the State to see what Telcordia had reported to the State about what all of Piscataway was being laid off – even if I'm not bound by the way they divided up Piscataway – what I would have seen is that for all of Piscataway, during the three-month period, September to November, they reported 463 layoffs, 37 short of the 500 cutoff, as opposed to well over 600 that the discovery tells us were really laid off. What I've told the client, what I've said is, unless I'm prepared to show that those figures are inaccurate, you don't have a case. They were denied that opportunity, Judge. Thank you. But if you were the lawyer representing an aid company, probably one of the first things you would have said is, don't sign that release until we get the facts here for me to make a determination to advise you whether they need to comply with the Lord Act. Probably what you would then do is enter into some discussions with the company in order to satisfy yourself if the company does or does not need to comply. Unless I did what at least two of the employees here said they did, which is, the company had treated us fairly over the years – this is almost a quote – I had some doubts about what was going on here, but in the end I trusted that they wouldn't misrepresent to us. I think that is the standard. Thank you. Thank you, Will.